MARSHALL *v.* STATE.

[85 South. 184. In Banc. No. 21377.]

1. CRIMINAL LAW. *Error, not substantially injuring accused, will not cause a reversal.*
   Error which has resulted in no substantial injury to the accused on trial will not cause a reversal.

2. CRIMINAL LAW. *Evidence, admitted without objection, cannot be complained of.*
   Evidence which was introduced without objection cannot be complained of on the ground that it was not competent in the case.

3. HOMICIDE. *Evidence held to sustain conviction.*
   Evidence *held* sufficient to sustain a conviction of murder.

APPEAL from circuit court of Lee county.

HON. C. P. LONG, Judge.

Charlie Marshall was convicted of murder and sentenced to be hanged and he appeals. Affirmed.

*T. K. Boggan* and *Claude Clayton,* for appellant.

*H. C. Holden,* Attorney-General, for the State.

HOLDEN, J., delivered the opinion of the court.

This is an appeal by Charlie Marshall, who was convicted of murder and sentenced to be hanged. The story of the crime, as shown by the testimony in the record and declared to be true by the verdict of the jury, is one of fiendish brutality, unparalleled in the criminal history of the state.

On the night of January 15, 1920, about 7 o'clock p. m., the home of Bob Miller and his family, who lived about four miles northwest of the town of Amory, was dynamited, and immediately following the explosion, Bob Miller, his son Leonard, and his daughter Fannie were shot and killed through the windows of the house. Burley, the child of Fannie, was also struck dead by the murderer. The house was then set on fire by the assassin and burned to the ground, cremating the bodies of the dead.

Bob Miller was the father and head of the family and had living with him his son Leonard, sixteen years of age, his daughter Fannie, seventeen years old, and a daughter, fourteen years old, named Pearl May Miller. Burley Miller was an illegitimate child, and at the time of the tragedy there was pending in court a bastardy proceeding against the appellant, Charlie Marshall, a bachelor living a mile away.

Pearl May Miller, the fourteen year old girl, was in the house at the time of the explosion, and witnessed the killing of all of the members of her family, and positively recognized appellant as the murderer. She had lived within one mile of appellant, and had known him for several years. Her testimony in this case is indeed remarkable for its clearness and simplicity. Her calm and intelligent statement of what she saw and experienced is convincing that she spoke the truth as it can only be spoken by a child.

It was after dark, and the family was sitting around the fireside, when they heard the dog bark on the outside. The father and son went to the door, but shortly returned to the room. The dynamite explosion under the floor then took place, blowing a large hole in the floor close to the fireplace. Pearl May Miller was stunned by the shock, but recovered shortly. Immediately following the explosion, a shot was fired through the window, and Bob Miller fell dead. Another shot was quickly fired, which killed Leonard Miller. By this time Pearl May Miller and her sister Fannie, with her infant in her arms, went into the dining room and got behind the door. Fannie then sat upon a meat box, and while sitting there another shot was fired through the south window in the dining room and Fannie fell dead to the floor, and the baby fell from her arms and crawled upon the floor. At this junction, while Pearl May was behind the door the appellant, Charlie Marshall, came up through the hole in the floor, and as he came up, with the light of the fireplace shining upon his face, Pearl May looked at him from behind the door and clearly recognized him. The appellant then approached the innocent, crying babe crawling upon the floor, and as it looked at its reputed father he struck it dead with a weapon; he then proceeded to pour coal oil about in the house and set it afire.

In the meantime Pearl May had climbed to the loft in the dining room and crawled over the ceiling of the room with the fireplace and looked through a crack for an instant at the atrocious work of the appellant. She then crawled over to another room, got down on a bed in that room, and escaped through a window, running, walking, and crawling through the swamp for more than a mile to the house of a neighbor by the name of Wright.

She calmly stated to Mr. Wright that the appellant Marshall had committed the crime, and detailed every part of the dastardly work done by the appellant. (There

was no objection 'to this testimony).. She described definitely the hat, raincoat, blue overalls, and laced boots worn by the appellant, and told where the bodies of her relatives would be found lying in the house, and described from whence came the shots that had wiped out her family. Later, when search was made, the charred bodies were found in the exact positions named by her. Empty shells were found at the windows on the outside from whence the shots had come as she had described. These shells were identified by the plunger marks as having been shot in the single-barrel gun of appellant. Her description of what the defendant wore was corroborated, and even admitted, by the appellant on the stand. The wet raincoat was found in the home of appellant, his overalls had been hidden, and his high-laced boots were buried under the hay in the loft of his barn. His single-barrel gun with the peculiar plunger had been freshly shot. Afterwards, when his premises were searched, several sticks of dynamite were found hidden under the barn. He had purchased the dynamite a short time previous to the crime. The seller of the dynamite, who was a merchant at Aberdeen, identified the appellant as the purchaser, and also identified the remaining sticks of dynamite as the kind that he had sold appellant.

It is in evidence that the appellant had threatened to do violence to the Miller family so that they could not appear against him in the court proceedings. When appellant was arrested he made statements as to his whereabouts at the time of the explosion, which he contradicted afterwards at the trial. His defense was an *alibi*, claiming that he was at his father's house, eating supper, at the time the explosion was heard. A large number of people of the community passed the appellant's house, going to the scene in automobiles and other conveyances, all of which appellant said he saw, but which did not excite his curiosity sufficiently to cause him to inquire what had happened, or to look at the burning house but

a mile away. The Marshall family, according to the testimony seemed to have been utterly unconcerned as to anything pertaining to the terrible crime committed close by.

The record also discloses that it was possible for the appellant to have committed the awful crime and then fled to his father's house and taken supper there as claimed by him. The jury was well warranted in disbelieving the *alibi* on account of the contradictory and unsatisfactory proof offered to support it.

The story of the horrible affair as told by this intelligent child witness, Pearl May Miller, was unshaken throughout the different investigations and trial of the case. There is not a self-contradiction in it, and it was positively corroborated in every detail by the physical facts and circumstances in the case. The jury was eminently justified in believing her simple and straightforward story, for its truthfulness must have been apparent to all. She was spared that she might reveal the perpetrator of this dastardly deed, that justice could be done, and the law vindicated.

The appellant presents nineteen assignments of error, upon which he seeks a reversal of the judgment of the lower court. We have patiently and carefully reviewed and considered each assignment, and we find that none of them are well taken, except perhaps one, which, if error, is only technical, and was harmless to the defendant in the trial; and, since no substantial injury was done the appellant, it will not justify reversal.

There was no error in the admission or exclusion of testimony, nor in the giving or refusing of instructions. The jurors were competent and qualified under the law to sit in the case; the remarks of the trial judge were not improper and prejudicial; and the fact that the jury took with it when it retired the other indictments against the appellant was not harmful error, because the jury already knew from the facts in the case what the other

indictments contained, and besides this the court instructed the jury to disregard and not consider the other indictments in the case.

The judgment of the lower court is affirmed, and the date of the execution is set for Friday, August 20, 1920.

*Affirmed.*